[No. 79951-2.    En Banc.]

Argued May 24, 2007.    Decided November 15, 2007.

JAMES A. DENSLEY, *Appellant*, v. THE DEPARTMENT OF RETIREMENT SYSTEMS, *Respondent*.

*James Densley*, pro se.

*Robert M. McKenna, Attorney General, Timothy D. Ford, Deputy Solicitor General*, and *Johnna S. Craig, Assistant Attorney General*, for respondent.

214

¶1 ALEXANDER, C.J. — We are called upon to interpret a statute, RCW 41.40.170(3), that entitles public employees to retirement service credit in the Washington Public Employees' Retirement System Plan 1 (PERS 1) for certain military service. James Densley appeals the decision of the Washington State Department of Retirement Systems (DRS) that denied him service credit under that statute for a portion of his military service that predated his public employment, to wit: weekend drills and summer training camps he participated in as a member of the Washington Army National Guard, time he spent traveling home from active duty, and a one-day physical examination he underwent while he was a member of the United States Army Reserve. The primary question before us is whether the aforementioned statute provides retirement service credit for military service that is not "active federal service" and, if not, whether drills and training with the Washington Army National Guard are "active federal service."

¶2 We hold that RCW 41.40.170(3) does not require military service to be active federal service. Thus, Densley's service with the Washington Army National Guard qualifies for retirement service credit. Nevertheless, we hold that he is not entitled to service credit for the weekend drills, because at the time of that service, retirement credit was only given when 10 days or more were worked in a month. Densley's weekend drills amounted to only 2 days per month. We, therefore, affirm the portion of the Pierce County Superior Court's decision that upheld DRS' denial of retirement service credit for Densley's weekend drills, and we reverse the remainder of the decision.

I

¶3 In 1972, Densley was commissioned as a second lieutenant in the United States Army Reserve (Reserve), under Title 10 U.S.C. In that year, he was on active duty for three months at Fort Eustis, Virginia. The army allowed Densley 10 days for travel to and from his active duty

service, and he claims to have spent 5 of those days in transit home, from November 8 to 12, 1972.

¶4 On November 14, 1972, Densley joined the Washington Army National Guard (Guard). For the next three-and-a-half years, Densley participated in a 2-day weekend drill each month and an annual 15-day training camp each summer. In April 1976, he transferred from the Guard to the Reserve. He remained a member of the Reserve until his mandatory retirement in 2000. In September 1976, Densley was ordered to report for a physical examination and did so. The army deemed this as one day of inactive service.

¶5 The following year, in May 1977, Densley was hired as a deputy Pierce County prosecuting attorney. As a public employee, he became eligible for membership in PERS 1 at that time. He later established retroactive membership in PERS 1 to May 1977. He remained a public employee until his retirement from the Pierce County prosecutor's office in December 2005.

¶6 Densley was called to active duty with the army for three months in 1990, during Operation Desert Shield/Desert Storm. DRS gave Densley three months of retirement service credit for active duty service, pursuant to RCW 41.40.170(1). After Densley completed 25 years of service credit with PERS 1, DRS also credited him with three months of service, under RCW 41.40.170(3), for his pre-employment active duty at Fort Eustis, Virginia, in 1972.[1]

¶7 In 2004, Densley requested additional retirement service credit for the 3 summer trainings and 41 weekend drills he attended with the Guard. The DRS plan administrator denied this request. Densley petitioned the DRS petitions examiner for an internal review, seeking reversal of the plan administrator's determination. The petitions

[1] The three months of credit were given for the months of August, September, and October 1972. Densley received no retirement service credit for the month of November 1972 because he worked fewer than 70 hours in that month.

examiner denied Densley's petition, concluding that military service must be "active federal service" to qualify for retirement service credit under the provisions of RCW 41.40.170(3) and that, in her judgment, Guard training was not active federal service.

¶8 Densley appealed that decision to the DRS presiding officer. Densley and DRS both moved for summary judgment. The presiding officer denied Densley's motion and granted summary judgment in DRS' favor.

¶9 Densley petitioned the Pierce County Superior Court for judicial review. On review, the superior court affirmed the presiding officer's order, finding no errors of law and substantial evidence to support the findings of fact. Densley then appealed to the Court of Appeals, which certified the case to this court, determining "that it presents a fundamental and urgent issue of broad public import requiring prompt and ultimate determination." Order of Certification, *Densley v. Dep't of Ret. Sys.*, No. 35568-0-II, at 1 (Wash. Ct. App. Mar. 21, 2007). We accepted certification of the appeal and now review whether Densley is entitled to additional retirement service credit.

## II

¶10 Judicial review of an administrative action is governed by the Administrative Procedure Act (APA). RCW 34.05.510. A reviewing court will "grant relief from an agency order in an adjudicative proceeding" only in certain enumerated situations, including:

> (c) The agency has engaged in unlawful procedure or decision-making process, or has failed to follow a prescribed procedure;

> (d) The agency has erroneously interpreted or applied the law;

> (e) The order is not supported by evidence that is substantial when viewed in light of the whole record before the court . . . ;

> (f) The agency has not decided all issues requiring resolution by the agency;

. . . or

(i) The order is arbitrary or capricious.

RCW 34.05.570(3). Furthermore, a "court shall grant relief only if it determines that a person seeking judicial relief has been substantially prejudiced by the action complained of." RCW 34.05.570(1)(d). The person seeking relief bears the burden of proof. RCW 34.05.570(1)(a). When reviewing an agency's interpretation or application of a statute, this court uses the error of law standard and "may substitute its interpretation of the law for the agency's." *Postema v. Pollution Control Hearings Bd.*, 142 Wn.2d 68, 77, 11 P.3d 726 (2000) (citing *R.D. Merrill Co. v. Pollution Control Hearings Bd.*, 137 Wn.2d 118, 142-43, 969 P.2d 458 (1999)).

¶11 Most "employees of the state of Washington and its political subdivisions" are members of the legislatively created Washington Public Employees' Retirement System (PERS). RCW 41.40.020-.023. DRS is charged with administering and managing PERS. RCW 41.40.020; RCW 41-.50.030. PERS is currently divided into three plans. *See* RCW 41.40.010(33)-(35). "[P]ersons who first became members of the system prior to October 1, 1977," as Densley did, are covered by PERS 1. RCW 41.40.010(33). Benefits upon retirement depend partially on the years of service a member has provided. RCW 41.40.185. "Service" is defined as "periods of employment in an eligible position or positions for one or more employers rendered to any employer for which compensation is paid." RCW 41.40.010(9)(a). "Employer" includes any department or office of any political subdivision of the State, such as the Pierce County prosecutor's office. RCW 41.40.010(4)(a).

¶12 PERS 1 members can also receive service credit for certain military service they perform. RCW 41.40.170 provides:

> (1) A member who has served or shall serve on active federal service in the military or naval forces of the United States and who left or shall leave an employer to enter such service shall be deemed to be on military leave of absence if he or she has

resumed or shall resume employment as an employee within one year from termination thereof.

(2) If he or she has applied or shall apply for reinstatement of employment, within one year from termination of the military service, and is refused employment for reasons beyond his or her control, he or she shall, upon resumption of service within ten years have such service credited to him or her.

(3) In any event, after completing twenty-five years of creditable service, any member may have service in the armed forces credited to him or her as a member whether or not he or she left the employ of an employer to enter the armed service: PROVIDED, That in no instance, described in this section, shall military service in excess of five years be credited: AND PROVIDED FURTHER, That in each instance the member must restore all withdrawn accumulated contributions, which restoration must be completed within five years of membership service following the first resumption of employment or complete twenty-five years of creditable service: AND PROVIDED FURTHER, That this section will not apply to any individual, not a veteran within the meaning of RCW 41.04.005.

Subsection (1) allows service credit for "interruptive" active military service—active service that interrupts public employment. *See also* RCW 41.40.710(4) ("A member who leaves the employ of an employer to enter the uniformed services of the United States shall be entitled to retirement system service credit for up to five years of military service."). Subsection (3) entitles 25-year members to service credit for "noninterruptive" military service completed prior to their public employment.

¶13 Most of the limitations in RCW 41.40.170 are not at issue, it not being disputed that Densley: has completed 25 years of creditable service, has not claimed more than 5 years of military service credit, has not withdrawn accumulated contributions early, and is a veteran. Instead, this case turns on the meaning of the phrase "service in the armed forces" in subsection (3).

A. Does RCW 41.40.170(3) require "active federal service"?

¶14 DRS interprets the phrase "service in the armed forces," which appears in RCW 41.40.170(3), to require "active federal service," just as subsection (1) of that statute does. Because of this interpretation, it provides credit under subsection (3) only for noninterruptive "active federal service."

¶15 Where "a statute is clear on its face, its meaning [should] be derived from the language of the statute alone." *Kilian v. Atkinson*, 147 Wn.2d 16, 20, 50 P.3d 638 (2002) (citing *State v. Keller*, 143 Wn.2d 267, 276, 19 P.3d 1030 (2001)); *see also BedRoc Ltd. v. United States*, 541 U.S. 176, 183, 124 S. Ct. 1587, 158 L. Ed. 2d 338 (2004). "Courts should assume the Legislature means exactly what it says" in a statute and apply it as written. *Keller*, 143 Wn.2d at 276; *see also Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54, 112 S. Ct. 1146, 117 L. Ed. 2d 391 (1992); *State v. Roggenkamp*, 153 Wn.2d 614, 625, 106 P.3d 196 (2005). Statutory construction cannot be used to read additional words into the statute. *State v. Chester*, 133 Wn.2d 15, 21, 940 P.2d 1374 (1997). Neither should different language be read to mean the same thing. When the legislature uses two different terms in the same statute, courts presume the legislature intends the terms to have different meanings. *Koenig v. City of Des Moines*, 158 Wn.2d 173, 182, 142 P.3d 162 (2006) (citing *Roggenkamp*, 153 Wn.2d at 625); *see also State v. Beaver*, 148 Wn.2d 338, 343, 60 P.3d 586 (2002) ("When the legislature uses different words within the same statute, we recognize that a different meaning is intended."); *Simpson Inv. Co. v. Dep't of Revenue*, 141 Wn.2d 139, 160, 3 P.3d 741 (2000) (It is "well established that when 'different words are used in the same statute, it is presumed that a different meaning was intended to attach to each word.'" (quoting *State ex rel. Pub. Disclosure Comm'n v. Rains*, 87 Wn.2d 626, 634, 555 P.2d 1368 (1976))).

¶16 In RCW 41.40.170, the legislature used different terms in subsections (1) and (3) to describe the service which may be credited: "active federal service in the military or naval forces" and "service in the armed forces." One clearly appears broader than the other. Applying the aforementioned rule of statutory interpretation, we will presume that the legislature intended these two phrases to have different meanings.

¶17 This conclusion is supported by other words in subsection (3). The subsection begins with the phrase "[i]n any event," suggesting that credit may be given under the third subsection even if conditions in the first or second subsections are not met. That subsection goes on to say that "*any member* may have service in the armed forces credited" after 25 years of service. (Emphasis added.) Other wording in the subsection confirms that the phrase "any member" at least removes one of the restrictions placed in subsection (1): a member need not have left public employment to serve in the military. In our view, the word "any" in subsection (3) is broad and suggests that none of the restrictions from subsection (1) apply.

¶18 Our conclusion that the legislature intended different meanings to attach to the two phrases is also supported by the absence in subsection (3) of any words referring back to antecedent requirements. In subsection (1), the legislature used the words "*such* service" to indicate that the service it was referring to was that previously discussed: active federal service. (Emphasis added.) In subsection (2), the legislature not only repeated the phrase "such service," but also began the subsection by saying, "If *he or she* has applied" and went on to say, "within one year from termination of *the* military service," indicating that the reader should look back to the previous subsection to determine to whom and to what military service subsection (2) refers. (Emphasis added.) By contrast, subsection (3) does not use pronouns or adjectives to qualify its subject matter. Instead, it is directed at "any member" and any "service in the armed forces." RCW 41.40.170(3).

¶19 Notwithstanding the clear language of RCW 41-.40.170(3), DRS contends that the statute is ambiguous. Consequently, DRS asks us to look to the statute's legislative history and to give deference to DRS' own interpretation of the statute. When a statute is ambiguous, legislative history may be helpful in construing its meaning. *Roggenkamp*, 153 Wn.2d at 621. The interpretation given an ambiguous statute by the agency or department charged with its application may also provide useful guidance. Accordingly, this court gives " 'great weight' " to an agency's interpretation of an ambiguous statute within its area of " 'special expertise.' " *Port of Seattle v. Pollution Control Hearings Bd.*, 151 Wn.2d 568, 593, 90 P.3d 659 (2004) (quoting *Postema*, 142 Wn.2d at 77).

¶20 However, such deference is not afforded when the statute in question is unambiguous. *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984); *Pollution Control Hearings Bd.*, 151 Wn.2d at 593. Only statutes that are ambiguous require judicial construction, and statutes are "not ambiguous simply because different interpretations are conceivable." *Keller*, 143 Wn.2d at 276. Constructions that would yield " 'unlikely' " or " 'absurd' " results should be avoided. *Id.* at 277 (quoting *State v. Contreras*, 124 Wn.2d 741, 747, 880 P.2d 1000 (1994)).

¶21 We find RCW 41.40.170(3) to be plain and unambiguous. Hence, we decline to look beyond the language of the statute itself. Instead, we hold that RCW 41.40.170(3) expressly and unambiguously entitles 25-year members of PERS 1 to retirement service credit for all service in the armed forces not otherwise credited, whether or not that service amounts to "active federal service."

B. Should Densley have received credit for his Guard service?

¶22 Densley requests one month of retirement service credit for each of his summer camps and one-quarter month of credit for each of his weekend drills. In light of our

holding above, we need not decide whether service in the Guard is "active federal service." Since there is no question in this case that Guard training and drills are "service in the armed forces," both fall within the reach of RCW 41.40.170(3). That is the end of our inquiry as to the summer training camps; Densley is entitled to one month of service credit for each of the three summer camps.

¶23 However, Densley faces another hurdle before he can receive credit for his weekend drills with the Guard or for the one-day physical examination. In 1972, retirement service credit was earned only when "ten days or more" were worked "in any given calendar month." Former RCW 41.40.010(9) (1969).[2] The weekend drills in which Densley participated amount to only two days of service each month. Because of that, Densley would not have been entitled to service credit in 1972 for any of his weekend drills.

¶24 In 1991, the legislature amended RCW 41.40-.010(9)(a) and (b) to provide "one-quarter service credit month of service" for "less than seventy hours [of work] in any calendar month." Laws of 1991, ch. 343, § 6(9)(a), (b). A full service credit month was still provided for "full time work for seventy hours or more in any given calendar month." Former RCW 41.40.010(9)(a). These provisions are retained in the present version of RCW 41.40.010(9). Under the new version, Densley would have earned one-quarter service credit month for each of his weekend drills[3] and for

---

[2] Former RCW 41.40.010(9) provided in relevant part: "Full time work for ten days or more or an equivalent period of work in any given calendar month shall constitute one month of service. Only months of service shall be counted in the computation of any retirement allowance or other benefit provided for in this chapter." This subsection was amended in 1971, 1972, and 1973, but the wording of these two sentences remained unchanged until minor modifications were made in 1977. See Laws of 1971, 1st Ex. Sess., ch. 271, § 2; Laws of 1972, 1st Ex. Sess., ch. 151, § 1; Laws of 1973, 1st Ex. Sess., ch. 190, § 2; Laws of 1977, 1st Ex. Sess., ch. 295, § 16.

[3] If a full month of service credit is awarded for each of Densley's summer trainings in June 1973, June 1974, and July 1975 or for his travel and active duty in November 1972, then he would not receive an additional quarter-month of

his one-day physical examination. Densley asks us to apply the 1991 amendment retroactively.

¶25 As a general proposition, courts disfavor retroactivity. *State v. T.K.*, 139 Wn.2d 320, 329, 987 P.2d 63 (1999) (citing *In re Estate of Burns*, 131 Wn.2d 104, 110, 928 P.2d 1094 (1997)). "A statute is presumed to operate prospectively unless the Legislature indicates that it is to operate retroactively." *Id.* (citing *Landgraf v. USI Film Prods.*, 511 U.S. 244, 264-66, 114 S. Ct. 1483, 128 L. Ed. 2d 229 (1994); *State v. McClendon*, 131 Wn.2d 853, 861, 935 P.2d 1334 (1997); *Burns*, 131 Wn.2d at 110; *Adcox v. Children's Orthopedic Hosp. & Med. Ctr.*, 123 Wn.2d 15, 30, 864 P.2d 921 (1993); *In re Dissolution of Cascade Fixture Co.*, 8 Wn.2d 263, 272, 111 P.2d 991 (1941)). This presumption can only "be overcome if (1) the Legislature explicitly provides for retroactivity, *Landgraf*, 511 U.S. at 270, 278; (2) the amendment is 'curative,' *In re F.D. Processing, Inc.*, 119 Wn.2d [452,] 461-62[, 832 P.2d 1303 (1992)]; or (3) the statute is 'remedial,' *McClendon*, 131 Wn.2d at 861." *T.K.*, 139 Wn.2d at 332.

¶26 Densley claims that the 1991 amendment is explicitly retroactive. He points out that RCW 41.40.010 and the 1991 amendment were reenacted in 1993. LAWS OF 1993, ch. 95, § 8. The same act that reenacted them stated, "This act applies on a retroactive basis to members for whom compensation and hours were reported under the circumstances described in sections 1 through 6 of this act." LAWS OF 1993, ch. 95, § 9. A portion of section 2 covered service credit for interruptive military service. LAWS OF 1993, ch. 95, § 2(3), (4). Thus, the 1993 act appears to make the quarter-month-credit system apply retroactively to *interruptive* military service. However, it does not apply the 1991 amendment retroactively to *non*interruptive military service, such as the service at issue here.

¶27 Densley argues, additionally, that the 1991 amendment should be considered a remedial statute. "A remedial

credit for drills in those three months. RCW 41.40.010(9)(a) (members are not to receive more than one month of service credit for any calendar month).

statute is one which relates to practice, procedures and remedies . . . ." *McClendon*, 131 Wn.2d at 861 (citing *F.D. Processing*, 119 Wn.2d at 463; *Miebach v. Colasurdo*, 102 Wn.2d 170, 181, 685 P.2d 1074 (1984)). Such a statute will generally be applied retroactively, unless it affects a substantive or vested right. *Id.* However, Densley wants this amendment applied retroactively precisely *because* it provides him with a new substantive right: it would provide him with service credit to which he was not previously entitled. It would also provide him with credit that public employees working in the 1970s would not have received and cannot now receive, a disparity that the Court of Appeals has previously tried to avoid. *See Strong v. Dep't of Ret. Sys.*, 61 Wn. App. 457, 461, 810 P.2d 974, *review denied*, 117 Wn.2d 1021 (1991). The 1991 amendment gave part-time workers a substantive right to partial service credit. Consequently, we cannot conclude it was remedial legislation.

¶28 Because the 1991 amendment was neither remedial nor explicitly retroactive, it would be inappropriate to apply it retroactively. Accordingly, we affirm DRS' denial of additional retirement service credit for Densley's weekend drills and the one-day physical examination.

C. Should Densley have received credit for his travel home from active duty?

¶29 Densley also asks for service credit for his travel home from active duty in November 1972. Densley was on active duty for 7 days in November 1972, and he engaged in an additional 2 days of drills with the Guard that month. Thus, if he spent even 1 day traveling home from Virginia to Washington, and if such travel is considered a part of active duty, Densley performed the 10 days of service required to earn retirement service credit in 1972. No determination was made by DRS whether Densley actually spent a day traveling home from active duty, and such a determination would be required before Densley could be awarded credit for the month of November 1972.

However, because it is almost certain that Densley did travel for at least 1 day, we address the legal question of whether travel to and from active duty is a part of active duty for the purpose of determining retirement benefits.

¶30 Our own statutes and case law provide no assistance. Federal law does, however, indicate that authorized travel to and from active duty is a part of active duty. Title 38 U.S.C., on veterans' benefits, defines both " 'active duty' " and " 'active duty for training' " to include "authorized travel to or from such duty." 38 U.S.C. § 101(21)(E), (22)(E). The United States Court of Veterans Appeals interpreted these statutes and the corresponding regulations (38 C.F.R. § 3.6(b)(6), (c)(6)) to include authorized travel to and from active duty as a part of active duty for the purpose of determining benefit eligibility. *Pacheco v. West*, 12 Vet. App. 36, 37 (1998). Accordingly, Army Regulation (AR) 135-200 states that the date a soldier enters active duty or active duty for training is "the date the soldier officially begins travel," and the date of release from such duty will be at the conclusion of "travel time allowed for returning home."[4] Army Nat'l Guard & Army Reserve, Dep't of Army, *Active Duty for Missions, Projects, and Training for Reserve Component Soldiers*, AR 135-200, at 7 (June 30, 1999).

¶31 The United States Court of Appeals for the Fifth Circuit has held that an army medical officer was already on duty, "performing a specific duty which had been assigned to him" for purposes of the tort claims act, when he was traveling in his own automobile from home to his first duty station. *Hinson v. United States*, 257 F.2d 178, 182 (5th Cir. 1958). DRS distinguishes this case from Densley's on the basis that the medical officer in *Hinson* was paid for his days of travel. Densley may not have been paid for his travel; he claims he was, and this is unclear. However, like the medical officer, Densley was ordered to travel to active

---

[4] Densley's 1975 orders to Guard training use similar wording, noting that he will "be relieved from such duty" when he returns home and clarifying that he is ordered to training duty for the "period indicated plus allowable travel time." Admin. R. at 163.

duty, ordered to arrive by a certain date, authorized to use his own car, and provided a travel allowance. Like the medical officer, Densley's "only choice was the immaterial one of route and means of travel." *Id.* (footnote omitted).

¶32 Since travel to and from active duty for training with the United States military is considered by the federal government and federal courts to be a part of that duty, we conclude that Densley's travel home in November 1972 should be considered a part of his active duty and service credit should be afforded for it.

## III

¶33 Densley also claims that the entire final order of the presiding officer should be reversed due to certain alleged improprieties in the administrative review process. This claim, in our judgment, is entirely without merit.

¶34 Densley points out that, under the APA, a reviewing court may "set aside agency action" and "order an agency to take action required by law" or "to exercise discretion required by law," when "[t]he agency . . . has failed to follow a prescribed procedure." RCW 34.05.574(1), .570(3)(c). However, as noted above, we can grant such relief only if Densley "has been substantially prejudiced by the action complained of." RCW 34.05.570(1)(d). Densley does not explain how he has been substantially prejudiced. Instead, he incorrectly claims there is no requirement to show prejudice.

¶35 Densley also asks us to reverse the presiding officer's order under General Rule (GR) 31(e). That rule prohibits parties from including personal identifiers such as Social Security numbers in documents filed with the court. DRS did accidentally fail to redact Densley's Social Security number from several documents contained within the record it certified to the superior court on Densley's request. However, the remedies for this error are limited. A court may order redaction, on the identified person's motion, and

award the prevailing party reasonable expenses incurred in making the motion. GR 31(e)(2). The superior court appears to have taken these steps as soon as Densley drew the error to its attention. The original administrative record was sealed, and DRS submitted a redacted record at its own expense. There is no provision in GR 31(e) for reversing the order.

## IV

¶36 Finally, Densley requests attorney fees and costs for bringing this action. Under the equal access to justice act, a prevailing party in a judicial review of agency action is entitled to fees and other reasonable expenses, unless "the agency action was substantially justified or . . . circumstances make an award unjust." RCW 4.84.350(1).

¶37 In order to be granted fees and expenses on review, though, a "party must devote a section of its opening brief to the request for the fees or expenses." RAP 18.1(b). Densley did not even mention fees, expenses, or costs in his appellate brief to the Court of Appeals. In his reply brief, Densley included one line requesting "costs and fees for bringing this action," but he again failed to devote a portion of his brief to any argument on this point. Reply Br. of Appellant at 22. Although Densley did include a brief explanation of his request for fees in his memorandum to the superior court, we are of the opinion that this was insufficient.

¶38 In addition, Densley has gained at most 4 of the 14 months of service credit he sought through judicial review. Thus, it cannot be said that he substantially prevailed in this action.

¶39 Because Densley has neither properly requested fees nor substantially prevailed in this action, we deny his request for fees and expenses.

## V

¶40 RCW 41.40.170(3) unambiguously entitles 25-year members of PERS 1 to retirement service credit for all their

service in the armed forces, up to five years. That service need not be active federal service. However, because we decline to apply the 1991 amendments retroactively, military service prior to 1991 earned service credit under RCW 41.40.170(3) only if it amounted to 10 days or more in a single calendar month. Because Densley's summer trainings lasted 15 days, we conclude that he was entitled to one service credit month for each training. However, we also conclude that Densley was not entitled to service credit for his weekend drills and physical examination because that service fell below the 10-day requirement. Accordingly, we affirm the superior court opinion in part and reverse it in part.

¶41 We also hold that travel to and from active military duty is part of active duty for the purpose of determining retirement benefits. Thus, we remand this case to DRS for a determination of how long Densley spent traveling home from his basic training in 1972 and for entry of such orders as are consistent with this opinion.

¶42 Finally, we deny Densley's requests for attorney fees, expenses, and reversal based on alleged procedural improprieties.

C. JOHNSON, SANDERS, BRIDGE, CHAMBERS, OWENS, and J.M. JOHNSON, JJ., concur.

¶43 MADSEN, J. (dissenting) — RCW 41.40.170 permits retirement system service credit for military service predating public employment only where the military service is active federal service. However, the majority misconstrues the statute to mean that an individual who serves in the military before entering public employment is entitled to credit for all service in the armed forces, whether active federal service or not, based on different phrases used in the first three subsections of the statute. But when all six subsections of the statute are read together, it is obvious that the legislature meant one thing: active federal service.

¶44 The majority's erroneous construction of the statute is made obvious by considering its result: under the majori-

ty's construction, a retirement system member who leaves public employment to serve in the military receives less in retirement benefits based on military service than a member who serves in the military prior to public employment. On its face this makes no sense and the majority offers no reasonable explanation for such a result. A fundamental tenant of statutory construction is to avoid absurd or improbable results. Accordingly, I cannot agree with the majority's statutory analysis.

I. The Plain Language of RCW 41.40.170 Does Not Support the Majority's Conclusion

¶45 RCW 41.40.170 addresses retirement system service credit for employees who have served in the armed forces and who are members of Public Employees' Retirement System Plan 1 (PERS 1). Subsections (1) and (2) concern interruptive service and apply to individuals who leave public employment to serve in the military and then return to public employment either immediately or after an interval beyond their control. Subsections (5) and (6), which the majority does not quote or even mention, also pertain to interruptive circumstances under which military service may be credited for purposes of PERS 1. These subsections, enacted later than the first three subsections, confirm that the legislature's intent was that the same requirement apply in all instances, i.e., the requirement of active federal service.

¶46 The statute provides in full:

(1) A member who has served or shall serve on *active federal service in the military or naval forces* of the United States and who left or shall leave an employer to enter *such service* shall be deemed to be on military leave of absence if he or she has resumed or shall resume employment as an employee within one year from termination thereof.

(2) If he or she has applied or shall apply for reinstatement of employment, within one year from termination of *the military service*, and is refused employment for reasons beyond his or her control, he or she shall, upon resumption of service within ten years have *such service* credited to him or her.

(3) In any event, after completing twenty-five years of creditable service, any member may have *service in the armed forces* credited to him or her as a member whether or not he or she left the employ of an employer to enter the armed service: PROVIDED, That in no instance, described in this section, shall *military service* in excess of five years be credited: AND PROVIDED FURTHER, That in each instance the member must restore all withdrawn accumulated contributions, which restoration must be completed within five years of membership service following the first resumption of employment or complete twenty-five years of creditable service: AND PROVIDED FURTHER, That this section will not apply to any individual, not a veteran within the meaning of RCW 41.04.005.

(4)(a) A member, after completing twenty-five years of creditable service, who would have otherwise become eligible for a retirement benefit as defined under this chapter *while serving honorably in the armed forces* as referenced in RCW 41.04-.005, shall, upon application to the department, be eligible to receive credit for *this service* without returning to covered employment.

(b) Service credit granted under (a) of this subsection applies only to veterans as defined in RCW 41.40.005.

(5) The surviving spouse or eligible child or children of a member who left the employ of an employer to enter *the uniformed services of the United States* and died while *serving in the uniformed services* may, on behalf of the deceased member, apply for retirement system service credit under this subsection up to the date of the member's death in *the uniformed services*. The department shall establish the deceased member's service credit if the surviving spouse or eligible child or children:

(a) Provides to the director proof of the member's death *while serving in the uniformed services*; and

(b) Provides to the director proof of the member's honorable *service in the uniformed services* prior to the date of death.

(6) A member who leaves the employ of an employer to enter *the uniformed services of the United States* and becomes totally incapacitated for continued employment by an employer while *serving in the uniformed services* is entitled to retirement system service credit under this subsection up to the date of discharge from *the uniformed services* if:

(a) The member obtains a determination from the director that he or she is totally incapacitated for continued employment due to conditions or events that occurred while *serving in the uniformed services*; and

(b) The member provides to the director proof of honorable discharge from *the uniformed services*.

RCW 41.40.170 (emphasis added).

¶47 The meaning of a statute is reviewed de novo. *Wright v. Jeckle*, 158 Wn.2d 375, 379-80, 144 P.3d 301 (2006); *State v. J.M.*, 144 Wn.2d 472, 480, 28 P.3d 720 (2001). The court's goal is to ascertain and implement the legislature's intent. *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002). The starting point is the plain language and ordinary meaning; when the language of a statute is plain and unambiguous, a court must give effect to that language as the expression of what the legislature intended. *State v. J.P.*, 149 Wn.2d 444, 450, 69 P.3d 318 (2003). "The plain meaning of a statute may be discerned 'from all that the Legislature has said in the statute and related statutes which disclose legislative intent about the provision in question.'" *Id.* (quoting *Campbell & Gwinn*, 146 Wn.2d at 11). "In deriving the meaning of a statute, [a] court[ ] should 'read the statute in its entirety,' rather than isolating individual phrases." *Seto v. Am. Elevator, Inc.*, 159 Wn.2d 767, 774, 154 P.3d 189 (2007) (quoting *State v. Keller*, 143 Wn.2d 267, 277, 19 P.3d 1030 (2001)). "[A] doubtful term or phrase in a statute or ordinance takes its meaning from associated words and phrases." *Burns v. City of Seattle*, 161 Wn.2d 129, 148, 164 P.3d 475 (2007); *State v. Rice*, 120 Wn.2d 549, 560-61, 844 P.2d 416 (1993) ("the meaning of doubtful words may be determined through their relationship to associated words and phrases"). "The meaning of words in a statute is not gleaned from those words alone but from ' "all the terms and provisions of the act in relation to the subject of the legislation, the nature of the act, the general object to be accomplished and consequences that would result from construing the particular statute in one way or another." ' "

*Burns,* 161 Wn.2d at 146 (quoting *State v. Krall,* 125 Wn.2d 146, 148, 881 P.2d 1040 (1994) (quoting *State v. Huntzinger,* 92 Wn.2d 128, 133, 594 P.2d 917 (1979))).

¶48 As is immediately obvious, the legislature employed several phrases in RCW 41.40.170 to describe service in the armed forces—"active federal service in the military or naval forces," "the military service," "service in the armed forces," "serving honorably in the armed forces," "the uniformed services of the United States," "the uniformed services." But reading the statute as a whole can lead to only one reasonable result—that the same thing is meant by all of these terms. Active federal service is required in all circumstances. The majority concludes, however, that under subsections (1), (2), and (3), retirement system service credit must be given for other than active federal service in the case of service in the armed forces that precedes, generally, public employment, noninterruptive service, while for purposes of service that interrupts public employment credit is given only for active federal service.

¶49 The majority's result does not flow from the legislature's use of language. Subsections (1), (5), and (6) all pertain to interruptive service. While in subsection (1) the legislature refers to "active federal service," it does not do so in subsection (5), which authorizes a surviving spouse or eligible child to apply for retirement system service credit on behalf of a deceased PERS 1 member who leaves public employment to enter "the uniformed services of the United States" and dies while "serving in the uniformed services." RCW 41.40.170(5). The same is true of subsection (6), which authorizes a PERS 1 member to obtain retirement system service credit if he or she interrupts public employment to enter "the uniformed services of the United States" and then becomes totally incapacitated "while serving in the uniformed services." RCW 41.40.170(6).

¶50 Subsections (5) and (6) of the statute do not mention "active federal service" for purposes of interruptive service, and, just like subsection (3) at issue here, do not expressly refer back to the term "active federal service" in the first

subsection either. Yet, if subsections (5) and (6) are not read in the same way as subsection (1), the result is unlikely and absurd. There is no reasonable basis for reading one subsection pertaining to interruptive service to require active federal service and the others not to. In undertaking a plain language analysis, a court must avoid interpreting a statute in a manner that leads to unlikely, strained, or absurd results. *Berrocal v. Fernandez*, 155 Wn.2d 585, 590, 121 P.3d 82 (2005) (quoting *Burton v. Lehman*, 153 Wn.2d 416, 423, 103 P.3d 1230 (2005)); *State v. Votava*, 149 Wn.2d 178, 187, 66 P.3d 1050 (2003). Absurd results should be avoided because " 'it will not be presumed that the legislature intended absurd results.' " *J.P.*, 149 Wn.2d at 450 (quoting *State v. Delgado*, 148 Wn.2d 723, 733, 63 P.3d 792 (2003) (Madsen, J., dissenting) (citing, among other cases, *State v. Vela*, 100 Wn.2d 636, 641, 673 P.2d 185 (1983))).

¶51 Instead, subsections (5) and (6) should be read in the same way as subsection (1), regardless of whether the exact same words are used, because they all pertain to the same situation—interruptive military service. Because this is so, the majority's analysis based on different words to describe military service is seriously flawed. Just as the legislature uses different but interchangeable language to describe such service in subsections (1), (5), and (6), all pertaining to interruptive service, so are different phrases used to describe military service for purposes of interruptive and noninterruptive service in subsections (1) and (3). Just as in the case of the different subsections pertaining to interruptive military service, this means no more than that the legislature did not believe it necessary to use the exact same turn of phrase in each instance to describe the type of military service intended, because it identified that type of service in the first subsection for all circumstances as active federal service.

¶52 The majority's reading also leads to other absurd results, because it means that PERS 1 members who left PERS 1 employment to perform military service could receive less in PERS 1 retirement benefits than those whose

military service was performed before they began PERS 1 covered employment. There is simply no basis to read the statute to reach this unreasonable result, when nothing in the statute indicates this is what the legislature intended.

¶53 The majority's analysis is flawed for another reason. The majority reasons that the phrase "any member" in subsection (3) at the least removes the restriction in subsection (1) that the member must have interrupted public employment to serve in the military, and is broad enough to suggest that none of the restrictions in subsection (1) apply. The majority cites no authority for this reasoning and I can think of none that supports the conclusion. The legislature's choice to permit retirement system service credit for non-interruptive service once a member has 25 years of creditable service says nothing about whether "service in the armed forces" in subsection (3) has the same meaning as "active federal service" in subsection (1). In light of the legislature's interchangeable use of "active federal service" and "uniformed services of the United States" in subsections (1), (5), and (6), all pertaining to interruptive service, it is much more reasonable to conclude that the legislature intended "service in the armed forces," as in subsection (3), "uniformed services of the United States" and "uniformed services," as in subsections (5) and (6), and "active federal service," as in subsection (1), to mean the same thing. As stated earlier, when read as a whole, the statute clearly pertains to one, and only one, kind of military service: active federal service.

II.   Amendments to RCW 41.40.170 Demonstrate that Benefits Apply Only to Active Federal Service

¶54 The statute's language over time shows there is no doubt that the legislature meant the same thing by all of the phrases it used. RCW 41.40.170 was initially enacted without subsections. When there was only a single section, there was no question that each reference to military service was to the type of service stated in the first sentence of the statute, i.e., active federal service. *See* LAWS OF 1969,

ch. 128, § 7 (showing how the statute read before it was divided into subsections).[5] In 1972, the legislature subdivided the statute, with three subsections resulting—what are now the first three subsections of the statute. *See* LAWS OF 1972, 1st Ex. Sess., ch. 151, § 3. At the same time, it expressly provided for noninterruptive service, provided the member had 25 years of creditable service. But, as the Department of Retirement Systems explained in its order in this case, the legislature retained the phrase "active federal service" in the first section and retained as well its subsequent references just as they had appeared in the statute when it was one section. In other words, it is obvious that the legislature did not intend its choice of references to military service to have different substantive import. Although other changes have occurred in subsections (1) through (3) since that time (for example, references to individuals were made gender-neutral), the different references to military service have remained the same and still mean the same thing. Therefore, to count as retirement system service credit for PERS 1, service in the military must be "active federal service" no matter when it occurs.

¶55 The Washington National Guard is the organized militia of the State, under the control of the governor. RCW 38.08.020-.060. Members of the Washington National Guard are also subject to command by the president and

---

[5] The statute then provided:

A member of the retirement system who has served or shall serve on active. federal service in the military or naval forces of the United States and who left or shall leave an employer to enter such service shall be deemed to be on military leave of absence if he has resumed or shall resume employment as an employee within one year from termination thereof, or if he has applied or shall apply for reinstatement of employment and is refused employment for reasons beyond his control within one year from termination of the military service shall upon resumption of service within ten years from termination of military service or shall in all events after completing twenty-five years of creditable service have his service in such armed forces credited to him as a member of the retirement system: PROVIDED, That no such military service in excess of five years shall be credited: AND PROVIDED FURTHER, That he restore all withdrawn accumulated contributions, which restoration must be completed within five years of membership service following his first resumption of employment.

LAWS OF 1969, ch. 128, § 7.

the armed forces of the United States. *See Pepich v. Dep't of Def.*, 496 U.S. 334, 345-46, 110 S. Ct. 2418, 110 L. Ed. 2d 312 (1990) (discussing dual nature of the national guard). Under 10 U.S.C. § 12401, "[m]embers of the Army National Guard of the United States and the Air National Guard of the United States are not in active Federal service except when ordered thereto under law."

¶56 Accordingly, the only national guard service for which James Densley is entitled to retirement system service credit is active federal service performed under Title 10 U.S.C. orders, as the department concluded.

Conclusion

¶57 Because the majority erroneously interprets RCW 41.40.170, leading to unfair and absurd results, I dissent. I would affirm the department's order. I agree, however, that travel to and from active federal service is part of that service, as the majority reasons. Because the department has not had the opportunity to address the question whether and how much of Mr. Densley's claimed travel time is active federal service, remand on this issue as the majority directs is appropriate.

FAIRHURST, J., concurs with MADSEN, J.